IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.                            ) | Cr. No. 3:15CR77 |
| ) | |
| NASSAU LUCAS,                 ) | |
| ) | |
| Defendant.                    ) | |

### RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
### FOR DOWNWARD VARIANCE AND ADJUSTMENT

COMES NOW, the United States of America, and responds in opposition to the defendant's motion for a downward variance and adjustment from the Guideline Range of 140 to 175 months down to 100 months in prison. The defendant argues that the nature and seriousness of his offenses are mitigated by the fact that but for the action of the undercover agents, he never would have committed the crimes. In support of this argument defense counsel cites a series of entrapment cases that hold that it is improper for the government to "create," "instigate" and "provoke" the commission of a crime and then punish it. D. Motion pp. 4 and 5. The defense also argues that Criminal History Category VI overstates the seriousness of his criminal history because of the inclusion of two misdemeanor convictions. Neither argument has merit and should be rejected.

### I.  FACTUAL BACKROUND

A review of the defendant's criminal history starting in 2009 makes it clear

1

that he has committed numerous crimes, including 3 firearm offenses, drug possession, and drug trafficking. Some crimes have even been committed while he was under court supervision from a previous conviction. It is not surprising then that his continuous illegal activities aroused the separate attention of two law enforcement agencies in 2014. Accordingly, the Henrico County Police Department started a drug investigation in or about July 2014. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began a firearms trafficking investigation in or about late June 2014. Both investigations were initiated on the basis of information from different informants. ATF TFO Michael Kielb did more research into Lucas's prior record, lack of a job, and driving high end vehicles like a Mercedez Benz and later a BMW. Thus there is no argument that law enforcement negligently or irresponsibly targeted an innocent mane. In or about early August 2014, the two agencies joined forces.

     The suspected firearm and drug offenses were the type of offenses that "present the police with unique and difficult detection problems because they are committed privately between individuals who are willing participants. Consequently, in addition to employing search and seizure techniques, routine and electronic surveillance, and informants to expose such consensual crime, law enforcement officers resort to the use of encouragement [by the police or their agents]. 2 W. LaFave, Criminal Procedure, § 5.1(a) p. 621 (4d. Ed.) (herein

"LaFave"). Indeed, because of the detection problems, the ATF and Henrico Police resorted to undercover encouragement operations.

Accordingly, as part of this joint investigation, on the afternoon of August 11, 2014, a Henrico Police confidential informant, who was secretly wired for sound and photographing, made a purchase of one pound of marijuana from Lucas. The Police searched the confidential informant before the deal and no contraband was found. Two police officers in a nearby unmarked police van also observed, videotaped and listened to most of the transaction, which initially took place across the street from the defendant's apartment at Oakwood Apartments in the 3500 Block of East Richmond Road, Henrico County, and ended up in the parking lot of the apartment. The suspected marijuana was submitted to a laboratory which determined the substance to be 439.12 grams of marijuana.

In the afternoon of August 13, 2014, ATF used an undercover police officer to purchase an Intratec 9mm semi-automatic pistol from the defendant in the parking lot of his apartment at 1467 Old Bronze Drive, Henrico, Virginia. The undercover police vehicle was wired for sound and photographing. The videotape of the deal introduced at trial, showed a smiling Lucas as he sold the gun, dispelling any notion that he was being improperly induced to sell the gun.

One month later, on September 12, 2014 ATF used two undercover police officers to purchase an SKS 7.62 caliber semiautomatic rifle from the defendant in

the parking lot of the BP gas station at 1130 New Market Road, Richmond, Virginia. The undercover police vehicle was wired for sound and photographing.

Finally, on the evening of November 5, 2014, a Henrico Police confidential informant was secretly wired for sound and photographing. The Police searched the CI before the deal and no contraband was found. This CI made a purchase of approximately 40 grams of crack cocaine. Because it was dark, the camera did not produce any recognizable pictures. Because many people could be heard talking on the audio portion, the audio portion did not produce any recognizable conversation. Because of the location of the deal, the police could not watch the deal taking place.

## II. ARGUMENT

The defendant argues that a he deserves a sentence below the guidelines because his offense was essentially the result of police encouragement even though their conduct did not rise to the level of entrapment that would justify an acquittal. He also argues his criminal history is overstated by one level because of the inclusion of 2 misdemeanors. These arguments are without merit.

### A. Entrapment

As mentioned before, firearms and drug offenses present detection problems thus justifying the resort to undercover operations that encourage suspects to engage in criminal activity. 2 LaFave, § 5.1(a) p. 622. The law of entrapment thus

4

developed to place a limit on the more extreme forms of encouragement. *Id.* §5.1(b). "Of central concern is the possibility that the encouragement might induce a person who otherwise would be law-abiding to engage in criminal conduct." *Id.* Entrapment is a complete defense to a criminal charge, on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992).

A valid entrapment defense has two related elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Of the two elements, predisposition is by far the more important. *Accord United States v. Hackley*, 662 F.3d 671, 681-82 (4th Cir. 2011); *United States v. Sligh*, 142 F3d 761, 762 (4th Cir. 1998).

<u>Inducement</u>. Inducement is the threshold issue in the entrapment defense. It requires the defendant to present evidence that the government induced him to commit the offense. *Sligh,* 142 F.3d 762-63. Mere solicitation to commit a crime is not inducement. *Id*. at 763. Nor does the government's use of artifice,

stratagem, pretense, or deceit establish inducement. *Sorrells v. United States*, 287 U.S. 435, 441 (1932).

Inducement is a term of art involving governmental overreaching and "conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party. Solicitation, by contrast, is the provision of an opportunity to commit a criminal act." *Sligh,* 142 F. at 763 (internal quotations and citations omitted.) *See also United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984) (inducement shown only if government's behavior was such that "a law-abiding citizen's will to obey the law could have been overborne"); *United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989) (inducement shown if government created "a substantial risk that an offense would be committed by a person other than one ready to commit it").

Predisposition. If the defendant meets his initial burden, "the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Sligh*, 142 F.3d at 762-63. Even if inducement has been shown, a finding of predisposition is fatal to an entrapment defense. The predisposition inquiry focuses upon whether the defendant "was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63. Thus,

predisposition should not be confused with intent or mens rea: a person may have the requisite intent to commit the crime, yet be entrapped. Also, predisposition may exist even in the absence of prior criminal involvement: "the ready commission of the criminal act," such as where a defendant promptly accepts an undercover agent's offer of an opportunity to buy or sell drugs, may itself establish predisposition. *Jacobson*, 503 U.S. at 550.

*United States v. Ramos*, 462 F.3d 329, 334 – 335 (4th Cir. 2006) is also instructive on the wide scope of predisposition evidence. The investigation started off with a drug informant who initially made drug buys from the defendant and later on suggested purchasing and actually did purchase firearms. The defendant requested an entrapment instruction based on the argument that he was only predisposed to sell drugs not firearms. In rejecting the defendant's argument, the court stated:

> Predisposition is not limited only to crimes "specifically contemplate[d]" by the defendant prior to government suggestion, but encompasses decisions to commit the crime that is "the product of his own preference and not the product of government persuasion." *Hsu,* 364 F.3d at 198 (quoting *United States v. Osborne,* 935 F.2d 32, 38 (4th Cir.1991)). "[W]hen government agents merely offer an opportunity to commit the crime and the defendant promptly avails himself of that opportunity, an entrapment instruction is not warranted." *United States v. Harrison,* 37 F.3d 133, 136 (4th Cir.1994).

*United States v. Ramos*, 462 F.3d at 334 – 335.

<u>Evidence of Predisposition</u>. A defendant who claims that he was entrapped

7

opens himself to "an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Sorrells v. United States*, 287 U.S. 435, 451 (1932). Thus, predisposition may be shown by evidence of other crimes that might not otherwise be admissible.

Predisposition evidence can also come from the defendant's conduct leading up to and during the charged offense. This can show whether there is ready acquiescence, expert knowledge of criminal activity, future plans and access to contraband. *See* 2 Lafave 5.3(a) at p. 651.

<u>Entrapment as a Mitigating Sentencing Factor</u>. The defendant's variance motion raises the issue of whether an offense encouraged by law enforcement that does not meet the culpability-removing standards for entrapment at trial can be a culpability-mitigating factor at sentencing under Section 3553(a). This issue is based on what has been known as the doctrine of imperfect entrapment as a theory of sentencing mitigation. *See United States v. McClelland*, 72 F.3d 717, 724-25 (9th Cir. 1995) and *United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2000).

The undersigned has found no case in the Fourth Circuit directly addressing this issue. However, in *United States v. Jones*, 183 F.3d 1145, 1151 – 5 (4th Cir. 1994), the court discussed the somewhat related theories of "sentencing entrapment" and "sentencing manipulation." Sentencing entrapment is when, in order to increase the defendant's sentence, a government agent convinces the

8

defendant to engage in conduct carrying higher penalties. Sentencing manipulation is when the government enlarges the scope or scale of the crime to secure a higher sentence. In *Jones*, the court withheld judgment on the viability of the theories but rejected the applicability of both theories to the particular facts of that case. *Accord United States v. Ramos*, 462 F. 3d at 335.

In *United States v. Beltran*, 571 F3d. 1013, 1019, fn.1 (10th Cir. 2009), the Tenth Circuit has noted that variance for sentencing entrapment and manipulation is permissible. The court then rejected the variance under the particular facts of the case. And in an unpublished opinion, the Sixth Circuit commented favorably on the theory but would not take a final stand on this issue. *United States v. Smith*, 358 Fed. Appx. 634 (6th Cir. 2009).

Application of Law to Facts. Applying all of these principles, the defense argument must be rejected. The defendant does not establish that he was anywhere close to being entrapped when he sold a high capacity firearm to undercover police officers on two occasions. There was no evidence of inducement such as that the police engaged in overreaching by intimidation, threats, dogged insistence, excessive pressure or exploitation of a noncriminal motive. *See United States v. Vasco*, 564 F.3d 12 (1st Cir. 2009) (finding no hard facts of inducement to justify even a jury instruction). Lucas was simply a longtime criminal who was committing difficult to detect wrongdoings and who was merely encouraged to

9

commit a crime by an undercover police officer. There is no mitigation in the facts of the present case.

Assuming *arguendo* there was inducement, Lucas was clearly predisposed to commit the crimes, thus abrogating any entrapment defense. The evidence overwhelmingly established that defendant "was [not] an unwary innocent [but rather] an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63.

Before the investigation began, he had three firearm convictions: carrying a concealed weapon on 1/22/10; possession or transportation of ammunition for a firearm by a convicted felon and carrying a concealed weapon, 2d offense on 2/9/12. PSR ¶¶ 59 and 63. He also had two convictions for possession of marijuana with intent to distribute. PSR ¶¶ 64 and 65. While on probation for these last two offenses, his probation was revoked for using marijuana on seven occasions and lying about three of those uses. PSR ¶ 63. Moreover, while on probation for these firearm offenses, he committed the two new firearm offenses for which he is to be sentenced. PSR ¶ 68. So these prior offenses alone show predisposition. *See United States v. Ramos*, 462 F.3d at 334 – 335.

In addition, the trial testimony, corroborated by the tapes and the transcripts, show how ready and willing Lucas was to sell the firearms, his expert knowledge about these unusual firearms, and his ready access to the high capacity firearms.

10

### First Gun Sale

For example, in the first sale of the Intratec 9 to the female officer on August 13, 2014, the video and audio show no reluctance on the part Lucas at all.  Indeed, he is happily smiling through most of the deal.

Moreover, toward the end of the deal, something revealing happened.  He received call from someone who told him the police were circling the neighborhood.  Ex. 2A at 2.  Lucas's expression changed and he immediately left the car.  This is significant because it means that Lucas had other conspirators watching the neighborhood for the police during the deal with instructions to notify him if anything happened.  This shows a high sophistication in criminal activity.

### Second Gun Sale

The second sale, which was of the long SKS assault rifle, took place on September 12, 2014.  The events leading up to and during this deal also show strong evidence of predisposition.   Ex. 13A was the transcript of undercover officer Fernandez in his first conversation with Lucas on September 11, 2014, the day before the second gun sale.  This was the first time Fernandez ever talked to Lucas who initially does not know who Fernandez is.  After Fernandez mentions the name of the confidential informant, however, Lucas has no problem in talking about the illegal gun sale.  This shows that Lucas is the quintessential unwary criminal, and not an unwary innocent person.

11

Importantly, Lucas admits he already had in his possession a "chopper," which is the SKS that he sold the next day. *Id*. at 3 and 4. With respect to a Glock, another firearm, Lucas said "I might get something—I think I might get something, you know, um…like, uh, glock. But I'm waiting. I'm still waiting for that shit right now on **these people**. *Id*. at 3. (Emphasis supplied). The reference to 'these people' is further corroboration that Lucas has a ready source of supply for the guns -- hardly indicative of a law abiding citizen entrapped by law enforcement.

On September 12, 2014, the day of the actual sale, Officer Fernandez had another recorded conversation with Lucas. Ex. 15A. Lucas describes how he visited his source the night before to obtain a Glock but that the source, who had two on hand, had just sold them. *Id*. at 2. Lucas also said more guns were coming in next week. *Id*.

The video also shows further proof of the criminal sophistication of Lucas. Initially the deal was to take place in the parking lot of the 7-11, and indeed Lucas drove into the lot as the officers were in their car waiting. When Lucas saw how many people were already in the lot, he became wary and quickly moved the deal to the BP gas station across the street.

Revealingly in the car with him Lucas had someone else who obviously knew of the gun sale and was thus part of Lucas's conspiratorial operation. When they stopped, this conspirator tried to look natural by making believe the reason for

12

the stop at the gas station was to vacuum the car rather than selling a firearm. Ex. 15A at 1.

In the conversation during the deal, Undercover Officer Fernandez asked Lucas if he had "good connects." Lucas confirmed that he did. Then the two talked about yet another gun deal for the next week because more guns "should be coming in next week." *Id*. at 2. Lucas also talks about a Glock 40 and a Glock 9, *Id*. at 3, which shows sophistication about different types of firearms.

Therefore, the defendant has not established anything close to entrapment to mitigate he criminal conduct. His variance argument on this ground must be denied.

### B. Overstated Criminal History

The defendant also argues that Criminal History VI is too high because it is based in part on two old misdemeanors: a second offense of driving on a suspended license in January 2009 PSR ¶ 56 and carrying a concealed weapon in November 2009. PSR ¶ 59. This argument is without merit.

Although in the context of certain cases, the law permits departures for misdemeanors. The present case is not one of those cases. These misdemeanors were serious. Driving on a suspended license in and of itself is a serious offense. Doing it for the second time is obviously more serious. Carrying a concealed weapon is extremely serious, especially when considered in light of the subsequent

firearms offenses and the current firearms conviction upon which he is before the Court on sentencing. Moreover, these misdemeanors are not simply old isolated minor offenses. They are the beginning of a continuous course of criminal activity from 2009 until he was arrested for violating his probation in June 2014. So in the context of this case, the inclusion of the misdemeanors to produce a Category VI does not overstate his criminal history and certainly does not overstate the likelihood Lucas will commit future crimes.

Moreover, taken as a whole, the total criminal history score of only 13 actually understates his criminal history and the likelihood of future crimes. For example, he received no points for the serious crime of possession of marijuana with intent to distribute on September 15, 2011, PSR ¶ 64, because of the fortuitous fact that he was sentenced for the offense on February 9, 2011, the same day he was also sentenced for two firearms offenses occurring on April 8, 2011. PSR ¶ 63. Although this is permissible under Guideline Section 4A1.2(a)(2), it nevertheless has the effect in this case of understating the criminal history. PSR ¶ 63.

Viewing together all the offenses Lucas has been continuingly committing since 2009 more than supports the appropriateness of Criminal History Category VI.

### III.   CONCLUSION

The crucial sentencing factors are: (1) this 26-year old defendant's two serious current firearm offenses; (2) his lengthy criminal history, including drug trafficking, three firearms offenses, an assault on a law enforcement officer, and numerous violations of probation, that justifiably place him in a Criminal History Category VI; and (3) his commission of the current offenses while under a period of court supervision.

The seriousness of his conduct is further aggravated by the high capacity nature of the firearms and the fact that Lucas was just selling them to the highest bidder for what he thought was to be resale in New York. He demonstrated no thought or concern about who was ultimately receiving the firearms or how those recipients would use these deadly firearms in relation to others. Therefore, the Court should deny the present motion and sentence the defendant to 175 months in prison.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:   ___/s/_____
David T. Maguire
V.S.B. No. 23229
Assistant United States Attorney
Office of the United States Attorney
600 E. Main Street, Suite 1800
Richmond, Virginia 23219

(804) 819-5400
(804) 771-2316 (facsimile)
David.maguire@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of March, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to Vaughan C. Jones, Counsel for the defendant.

_____/s/_____
David T. Maguire
Assistant United States Attorney