IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

```
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     )
UNITED STATES OF AMERICA             )
                                     ) Criminal No.
v.                                   ) 3:15CR77
                                     )
NASSAU LUCAS                         ) April 7, 2016
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
```

COMPLETE TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

David T. Maguire, Assistant United States Attorney
Office of the U.S. Attorney
SunTrust Building
919 East Main Street, Suite 1900
Richmond, Virginia   23219

        Counsel for the United States

Vaughan C. Jones, Esquire
Attorney at Law
1622 West Main Street
Richmond, Virginia   23220

        Counsel for the Defendant


        DIANE J. DAFFRON, RPR
        OFFICIAL COURT REPORTER
        UNITED STATES DISTRICT COURT

1       THE CLERK:  Case number 3:15CR77, the United

2  States of America versus Nassau Lucas.

3       The United States is represented by David

4  Maguire.  The defendant is represented by Vaughan

5  Jones.

6       Are counsel ready to proceed?

7       MR. MAGUIRE:  The United States is ready.

8       MR. JONES:  The defense is ready, sir.

9       THE COURT:  All right.  Good afternoon.

10       MR. MAGUIRE:  Good afternoon, Your Honor.

11       We're here for the sentencing of Nassau Lucas

12  on two counts of being a felon in possession of a

13  firearm in violation of Section 922(g) of Title 18.

14  He's facing on that a maximum exposure of ten years in

15  prison on each count, $250,000 in fines, and three

16  years of supervised release.  The guideline range is

17  140 to 175 months, and there is a motion for a

18  downward variance.

19       THE COURT:  Is the maximum punishment 120

20  months on each count to be served consecutively or is

21  it -- because the guidelines here are 140 to 175

22  months.  Under Section 5G1.2D, the Court can impose a

23  sentence within the guidelines by imposing the

24  statutory maximum on one count and a consecutive

25  sentence on another count; is that right?

1          MR. MAGUIRE:  Yes, Your Honor.

2          THE COURT:  Is that what you think ought to

3    be done?

4          MR. MAGUIRE:  Yes, Your Honor.  That's the

5    stacking rule.  It's certainly within the Court's

6    discretion, but it's the way the guidelines normally

7    apply, and I submit that they should apply that way in

8    this case.

9          THE COURT:  All right.  Is there any

10   objection to the presentence report?

11         MR. JONES:  No, Your Honor.

12         THE COURT:  Stand up, please, Mr. Lucas.

13         Have you read the presentence report, Mr.

14   Lucas?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Have you reviewed it with your

17   lawyer?  Have you talked to your lawyer about it?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Do you understand it?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Are there any objections to it?

22         THE DEFENDANT:  No, sir.

23         THE COURT:  All right.  You may be seated.

24         The presentence report will be accepted,

25   adopted, and filed as tendered.  It will be placed in

1  the record.  It will be under seal.  It will be

2  available in the event of any appeal except for the

3  confidential sentencing recommendation part of it.

4         Is there any evidence on the variance or

5  sentencing?

6         MR. JONES:  There's no evidence on the

7  variance, Judge.  The only evidence I would have on

8  behalf of sentencing are some letters that were

9  tendered to me by various family members that I would

10  proffer to the Court.  I've not had an opportunity to

11  show those to counsel for the government, but I will

12  now.

13         That is the only evidence I have, Judge.  I

14  anticipate the government will have evidence.

15         THE COURT:  There's no objection to those

16  letters?

17         MR. MAGUIRE:  No, Your Honor.

18         THE COURT:  Hand them up now, and I'll read

19  them at this time.

20         Thank you very much.

21         All right.  Do you want these in the file or

22  do you want them to go to the probation office?

23         MR. JONES:  I'd like them to be made part of

24  the file, sir.

25         THE COURT:  All right.

1        MR. JONES:  Judge --

2        THE COURT:  Argument on the variance.

3        MR. JONES:  Yes, sir.  Judge, as the Court is

4   aware, I filed a motion for a variance below the

5   correctly calculated sentencing guideline range, which

6   calls for a sentence of 140 to 170 months.

7        Judge, the factor that I would first draw the

8   Court's attention to under 3553(a) is the nature of

9   the offense.  I in no way attempt to minimalize or

10  decry the serious nature of a previously convicted

11  felon or prohibited person from owning a firearm;

12  however, Judge, I would I draw the Court's attention

13  to what has been described in my conversations with

14  the attorney for the government as a quasi entrapment

15  defense or quasi entrapment sentencing position.

16       This is not an entrapment defense, Judge, and

17  this is not sentencing entrapment as the government

18  mentioned in its guidelines.  Sentencing entrapment is

19  a completely different concept that does not apply to

20  this case.  But what I bring to the Court's attention

21  is the analysis that years and years of review of

22  entrapment cases have considered, which is there is

23  something to be said for a person who might not have

24  otherwise committed the crime but for the actions of

25  the government.  Now, I do not say that there was a

1   perfect entrapment because clearly the defense in this
2   case would not have been able to overcome the hurdle
3   in this instance of the predisposition part of what
4   would be necessary for entrapment.  However, I think
5   when the defendant is accused by the government of
6   possessing firearms, it is a relevant sentencing
7   factor when determining the serious nature of the
8   offense to look at the facts of a case where the
9   government's own agents --
10          THE COURT:  What case are you talking about?
11          MR. JONES:  That makes the position that I'm
12   making to Your Honor now?
13          THE COURT:  Yes.  There's nothing that I know
14   of that recognizes that.
15          MR. JONES:  There isn't, Judge.  There is
16   not.
17          THE COURT:  There's sentencing entrapment,
18   which you say you're not doing.
19          MR. JONES:  Which does not apply here, sir.
20          THE COURT:  And there's sentencing
21   manipulation, which is not part of what you're doing.
22          MR. JONES:  It is not, sir.
23          THE COURT:  So there's no authority for what
24   you're asking for.
25          MR. JONES:  Judge, there is no authority --

1          THE COURT:  Or cases.

2          MR. JONES:  No, sir.  No, sir, there's not,

3    Judge.

4          THE COURT:  Okay.  So why should I grant a

5    variance then?

6          MR. JONES:  Because, Judge, although there's

7    no authority to go in this direction, I do think that

8    it is relevant when considering the serious nature of

9    the offense, which is a 3553, undisputed by either

10   side, as a relevant factor.  The serious nature of

11   this offense is belied by the fact that this is an

12   offense, and the Court heard all the evidence, that

13   the serious nature of this offense is belied by the

14   fact that the only reason Mr. Lucas committed the

15   actions at issue was because of the very direct

16   command and direction of the two undercover agents.

17         THE COURT:  You're arguing entrapment now.

18   You're arguing entrapment that would be a defense to

19   the case, which you say is not there.

20         MR. JONES:  It would not have been a

21   successful defense, Judge, because the government

22   would have been able to prove predisposition.

23         THE COURT:  Then you can't argue it here.

24         MR. JONES:  I'm arguing that the concept of

25   this defendant taking an action because the government

1  directed him to --

2      THE COURT:  He didn't direct him to.  The

3  facts in the PSR say that the defendant reached out to

4  confidential informant one before the sale of the

5  first gun, not the other way around.

6      MR. JONES:  The facts in the case, Judge, and

7  the facts that I cited to you in my sentencing

8  position paper were also, Judge, that the defendant

9  said on a couple of occasions that the guns that were

10 requested by the agent, and the agent requested

11 specific types of guns, the defendant said, "I don't

12 have them."

13     THE COURT:  That kind.  I don't have that

14 model.

15     MR. JONES:  That's accurate.

16     THE COURT:  That's the same thing as saying,

17 Steal me a Corvette, and the guy says, Well, I can't

18 steal you a Corvette because I can't get my hands on

19 one, but I can steal you a Jaguar.  That's what this

20 is, what your argument is, it seems to me.

21     MR. JONES:  I would say it's not quite the

22 same.

23     THE COURT:  It's still the intent to steal a

24 car in that example.

25     MR. JONES:  What I would say, Judge, is it

1    would be the same as if the person said, I don't have

2    a Corvette in my possession.  I can go out and commit

3    a crime if you are asking me to, and I'm willing to

4    commit a crime, which makes it not an entrapment

5    defense, but it is relevant, and I do differentiate

6    this case from a scenario where the police do a

7    traffic stop or do a search, and they find incident to

8    that search the defendant to be in possession of

9    multiple weapons, and then the presumption is, well,

10   this person is clearly flouting the rules against a

11   prohibited person owning these types of weapons.

12        I differentiate that from this scenario where

13   the defendant is saying, I don't have these weapons

14   you request, sir.  I can get them.  I'm willing to

15   break the law.  You have not enticed me illegally such

16   that it would be a defense to breaking the law, but

17   I'm willing to break the law on this occasion at your

18   request.

19        And, Your Honor, I'm not suggesting that he's

20   entitled to acquittal.  I'm merely suggesting that

21   when grading offenses of this particular crime, of 922

22   offenses, that this is not the most egregious one.

23   And as the Court --

24        THE COURT:  I believe you ought to put that

25   argument away.

1          MR. JONES: Yes, sir.

2          THE COURT: That's not very persuasive here

3 on the record of this case.

4          MR. JONES: Yes, sir.

5          THE COURT: You also argue -- are you asking

6 for a variance or are you just asking for me to

7 consider 4A1.3 as a departure or are you asking me to

8 consider 4A1.3 as a variance?

9          MR. JONES: Judge, I believe I requested it

10 as a variance. And the reason I would request it as a

11 variance, and I understand that the Court has just

12 issued an opinion on the argument that I've just made

13 to Your Honor, that this is outside what would

14 generally be a typical 922 violation in that this is a

15 person who was possessing guns at the request of a

16 government agent. And I understand what the Court's

17 said as far as its opinion about that argument.

18        I would move, Your Honor, in light of the

19 Court's position on that argument to his criminal

20 history category, which is a VI, which is correctly

21 calculated, but I would draw the Court's attention to

22 the fact that this defendant's criminal history is not

23 one which would generally say he is the highest or

24 most offensive prior convicted person who's got prior

25 convictions and that would say he's the highest level

1  of previous offender.  I understand that he's got a

2  high number of offenses.

3        I understand the government's position saying

4  that there are some offenses that are not even

5  contemplated or calculated in his criminal history;

6  however, be that as it may, Judge, this defendant gets

7  to be criminal history category VI, the highest level,

8  largely on the back of, not exclusively, but largely

9  on the back of driving offenses, misdemeanors.  And so

10 that is what has accelerated his guidelines to the

11 high level that it is presently standing.

12       I would say that he is not the typical

13 criminal history category VI offender in that the

14 majority of his prior convictions are these

15 misdemeanors that I've brought to the Court's

16 attention.

17       When the Court asked the government, Is this

18 defendant a person who should receive the statutory

19 maximum on one of these two offenses, I disagree with

20 the government quite directly.  I do not believe that

21 he is entitled or should be sentenced at the highest

22 level for either one of these offenses.

23            THE COURT:  All right.  Thank you.

24            MR. JONES:  I'm sorry, sir?

25            THE COURT:  I said, "All right.  Thank you."

1        MR. JONES:  Thank you, Judge.

2        MR. MAGUIRE:  I submit that the sentencing

3   factors, the normal ones, before I address the

4   variance, more than justify if not command a sentence

5   within the guideline range if not at the top end of

6   the guideline range.

7        The two offenses are very serious; possessing

8   firearms by a convicted felon on two occasions and

9   also the high capacity firearms.  You know, the

10  ability of those firearms to mow down a lot of people

11  in a short period of time go to the nature of this

12  offense.  So these are very serious offenses, and they

13  weigh heavily in favor of supporting the guideline

14  range.

15       The lengthy criminal record here also goes to

16  support the guideline range and certainly supports

17  category VI as it is.  We have three firearms'

18  offenses.  We have two drug trafficking offenses.  We

19  have an assault on a law enforcement officer.  We've

20  got numerous violations of the Henrico probation by

21  virtue of all the drug uses that he was involved in.

22  I think there's like five to seven of those.  And then

23  we have the most important violation of that

24  probation, and it goes to the seriousness in this

25  offense is that he's on probation while he's

committing the current offenses.

So those things together are very, very serious factors militating in favor of a very high and serious sentence.

We also have evidence that he's just not alone. He's got a little network out there. In the first gun deal where we had the female police officer in the car and the defendant is in the seat with her, and they're talking back and forth, and the defendant is pretty happy and smiling, and the deal takes place. And then at some point, if you will recall, we have the tapes here, and I've given the transcripts to the Court, it shows the defendant gets a telephone call in the middle of this and things change. His face changes. And he's saying, I'm out of here. I'm out of here. I'm out of here.

And then we hear further talk. He's gotten a call that there's police in the neighborhood. So to me this is a very important factor showing what this defendant is. He's got other people doing surveillance on this deal that are there to prevent the police from getting at him. So this goes to show he's a very serious offender who's a danger to the public interest.

The most important thing, I think, however,

1  is that when he's selling this gun, he's not selling

2  it to somebody he believes is a gun dealer or some

3  quasi law-abiding citizen.  He believes based on what

4  the guy is telling him he's a gun runner, and he's

5  going to take these guns to New York City and just

6  sell them to the highest bidder.

7          Where is the human concern on his part for

8  his fellow man, for people who are going to encounter

9  the ultimate recipients of those firearms, and how

10 those ultimate recipients of the firearms are going to

11 use them?  There's not one hint of that.

12         So I submit all that together shows that this

13 is a defendant who is a danger to the community.  And

14 from the standpoint of responsible sentencing, while

15 the Court might not want to sentence a young man like

16 him to the top of the range, I think when you look at

17 all of it together there's an argument that you have

18 to.

19         In preparing for this --

20         THE COURT:  One hundred and seventy-five

21 months?

22         MR. MAGUIRE:  Excuse me?

23         THE COURT:  You mean 175 months?

24         MR. MAGUIRE:  At the top of the sentence,

25 yes, Your Honor.  At the top of the range.

1       In preparing for this, I didn't want to do

2  this, to take such a harsh position, but I looked at

3  everything he had done since 2010.  There's just no

4  respect for the law, and there's no conscience about

5  what you're doing, and also there's not the common

6  sense out there to realize you can get caught.

7       In other words, I think people don't commit

8  crimes for basically two reasons:

9       (1) Their moral standard prevents them from

10  doing it; and

11       (2) They realize I can get caught and go to

12  jail.

13       People like Mr. Lucas don't seem to have

14  either.

15       When you look at these offenses --

16       THE COURT:  How does 5G1.2 apply here?  Which

17  part of it applies?

18       MR. MAGUIRE:  5G1.2.

19       THE COURT:  The stacking provision.  Which

20  part of it applies?

21       MR. MAGUIRE:  If I can get my book, Your

22  Honor.

23       It's B, Your Honor.  If a sentence imposed on

24  a count carrying the highest statutory maximum is less

25  than the total punishment, then the sentence that's

1    imposed on one or more of the counts shall run

2    consecutively but only to the extent necessary to

3    produce a combined sentence equal to the total

4    punishment.

5         THE COURT:  What's the meaning of the total

6    punishment there?

7         MR. MAGUIRE:  That the total punishment be

8    the total guideline calculation by the -- the total

9    PSR's guideline calculation.

10        THE COURT:  All right.

11        MR. MAGUIRE:  Would the Court like me to

12   address the quasi entrapment argument?

13        THE COURT:  Yes.

14        MR. MAGUIRE:  When I first read it, I was

15   trying to understand exactly what the defense counsel

16   was arguing.  He was saying "I'm not arguing

17   entrapment again," but yet all the cases he cites are

18   entrapment cases.  And so what he's in effect doing, I

19   realize, and it has support in some cases, is that

20   he's arguing entrapment as a mitigating factor.  A

21   quasi entrapment.  In other words, if you --

22        THE COURT:  But he says he's not doing that.

23        MR. MAGUIRE:  He may believe that, but I

24   don't think -- when you look at substantially what's

25   happening, that's in effect what he's doing.  And to a

1  great extent he may be better off if he does it that

2  way, and I'm, frankly, interested in having the record

3  reflect the issues in the most appropriate way

4  possible.

5           And as I read it, what he is arguing is that

6  it's something short of entrapment for guilt purposes

7  at trial.

8           THE COURT:  Yeah, but sentencing entrapment

9  is defined as outrageous official conduct which

10  overcomes the will of an individual predisposed to

11  engaging in minimal misconduct for the purpose of

12  increasing the sentence of the entrapped defendant.

13           Now, that to me -- and that's how it's

14  defined in U.S. against Jones.  He's not arguing that,

15  and I don't understand how the record would possibly

16  support that.  And then the other kind of quasi

17  entrapment that we've been able to find is called

18  "sentencing manipulation," which is defined as an

19  outrageous government conduct that offends due process

20  so as to justify a reduced sentence.  And that's also

21  in *Jones*, and he's not arguing that.

22           MR. MAGUIRE:  Right.

23           THE COURT:  In essence, what he's saying is,

24  look, he was a reluctant seller in a way because he

25  didn't really have the goods that they wanted, but he

1  said, "I'll go get them for you."  So therefore that

2  should mitigate.

3          Isn't that your argument, Mr. Jones?

4          MR. JONES:  I think that is the mitigating

5  element.

6          THE COURT:  That what he's saying should

7  mitigate.  The issue is whether it should or whether

8  it shouldn't.

9          MR. MAGUIRE:  I think it's being phrased a

10  little bit in the sense of a quasi entrapment.  In

11  researching this, and I've spent more time than I ever

12  believed I would, *Jones* is a 1994 case.  And in the

13  late '90s you saw the Ninth Circuit coming up with

14  theories of imperfect entrapment.

15          THE COURT:  The Fourth Circuit's never

16  adopted the imperfect entrapment theory of the Ninth

17  Circuit as reflected in those cases.

18          MR. MAGUIRE:  Right, Your Honor.

19          THE COURT:  Frankly, for good reason because

20  the imperfect entrapment theory, frankly, that they

21  use in the Ninth Circuit seems to me, in essence, to

22  be in reality an entrapment rule but just gussied up

23  to provide some amelioration.  In other words, it

24  seems to me to be dodging the real question.

25          MR. MAGUIRE:  But I think we have to realize

1  the pre-Booker context.  So what was happening in the

2  pre-Booker context is in undercover operations

3  defendants were probably pleading guilty for the most

4  part but trying at sentencing to use that as a ground

5  for departure because that was the primary vehicle in

6  those days.  And some courts were giving it a label of

7  imperfect entrapment.  And then there's the other

8  little different categories of sentencing entrapment

9  as *Jones* used it, which is different than this case.

10  THE COURT:  He says he's not pursuing either

11  one of the theories that are articulated in *Jones*.

12  MR. MAGUIRE:  But what I'm saying is that

13  post-Booker some defendants have argued what he's

14  arguing now, and the courts have looked at it in the

15  context of a variance.  And the sentencing factors --

16  THE COURT:  That's what he says we should be

17  doing.  He's said, Look at the offense conduct.  It

18  isn't all that bad because basically the government

19  was involved in it, and he had to go out and get

20  something different than they asked for, and so that

21  ought to be taken into account as an ameliorating

22  factor.  That's what he's arguing.

23  MR. MAGUIRE:  I think, admittedly, that's

24  what he's arguing.  And I think the present law today

25  is such that it can fit into the wide breadth of

1  sentencing factors, but you have to have the facts to
2  prove it.

3      THE COURT:  You don't mean that his argument
4  fits there.  You mean conceptually you can have some
5  situation that might make it fit, but he doesn't here;
6  is that what you're saying?

7      MR. MAGUIRE:  Right.  I think that's what my
8  argument is.  I think that's the safest certainly for
9  the appeal.  But I think what you have to realize, and
10 it's helped me to read some of the history of
11 entrapment going to the English case law and after.
12 And what you basically have here is the world of
13 encouraged criminal conduct where law enforcement is
14 encouraging the habitual criminal, hopefully, to
15 engage in criminal conduct, which you then punish him
16 for.

17      And society is faced with this because of the
18 difficulty of detecting and prosecuting certain
19 crimes.  So even in English times, they would have
20 these repeat criminals, and there would be in effect
21 undercover stings.  And there was absolutely no
22 sensitivity at that point for any entrapped defendant.
23      As we got into the early 17-, 18-, 1900s,
24 here the government, again, was faced with more and
25 more of the need to do it, but there was really not

1   much sensitivity to the potential for an innocent

2   person caught up in the sting.

3        THE COURT:  But the law is that you have to

4   have an absence of predisposition one way or the

5   other.

6        MR. MAGUIRE:  Right.  That's sort of the

7   current law which started really with *Sorrells* in

8   1932.

9        THE COURT:  In essence, you don't think he's

10  made out a case for any variance because the facts

11  here show that the defendant was predisposed to

12  violate the law?

13       MR. MAGUIRE:  That's one of the arguments.

14       THE COURT:  That's good enough.  Thank you.

15       I believe that's all I need to hear.

16       MR. MAGUIRE:  Okay.  And as I pointed out

17  there, what shows predisposition, just to give you

18  some of the evidence, and I just also want the record

19  to reflect that even though it isn't a true

20  entrapment, I think the entrapment elements are a good

21  analysis which require --

22       THE COURT:  Listen.  We're not going to hear

23  argument about entrapment when he's not arguing

24  entrapment.  He's just arguing that because the

25  government was involved and ordered up a particular

product, and he didn't have it.  He went out to get
it.  He maybe was even reluctant.  But that ought to
be taken into account in putting the sentence at the
low end of the guidelines or below the guidelines.

MR. MAGUIRE:  And my argument --

THE COURT:  I got your argument.  Thank you.

MR. MAGUIRE:  The priors and the facts of the
tapes show he was predisposed.

THE COURT:  Yes.

MR. MAGUIRE:  And --

THE COURT:  I understand.

MR. MAGUIRE:  So that's the essence of my
argument.  That's why I have to say that the high end
of the guideline to protect the public based on
everything that he's done is the responsible sentence
to impose.

THE COURT:  All right.  Thank you very much.

Anything else, Mr. Jones?

MR. JONES:  Yes, sir, Judge.

Judge, my final position on whether or not
it's a mitigating factor at least to the offense
conduct in this particular instance, I would draw the
Court's attention back to the evidence that the Court
heard at trial to the September 11, 2014 phone call in
which there was a phone call where the officer called

1  Mr. Lucas.  And the undercover officer said, "Okay.
2  What's up?"

3        And Mr. Lucas's direct response was, "Right
4  now I ain't got nothing, but" and then he says, "I
5  might get something."  I only draw that to the point
6  that the Court has already understood and already
7  heard me make that at that particular time prior to
8  being called by the undercover informant, the
9  defendant was a prohibited person, but he was not in
10 possession of firearms.  He did later commit the
11 crime.  I'm only saying to the Court that at one point
12 he was not possessing it and did not possess it until
13 the agent asked him for it.  And I think that that is
14 something that does mitigate the offense conduct in
15 this instance.

16        THE COURT:  All right.  Thank you very much.
17        On the ground of variance --
18        MR. MAGUIRE:  Your Honor, if I could just
19 point out that he kind of missed a key part of the
20 quote of that transcript that I think is important to
21 the Court.

22        THE COURT:  What is it?

23        MR. MAGUIRE:  Well, the exact quote, which is
24 on Government's Exhibit 13A, and this is the
25 transcript --

1          THE COURT:  What is it?  What's the quote?

2          MR. MAGUIRE:  The quote is, "So right now" --

3     and this is the target Lucas talking.  "Right now I

4     ain't got nothing but, um, chopper."  He's admitting

5     he's got the chopper.

6          THE COURT:  That's a word for AK47?

7          MR. MAGUIRE:  SK.

8          THE COURT:  SK, I'm sorry.

9          MR. MAGUIRE:  So he's admitting he's got it

10    in his possession.  So he left that particular part

11    out.

12         THE COURT:  Okay.  Thank you.

13         This is not sentencing entrapment as defined

14    by *Jones* or sentence manipulation as defined by *Jones*

15    argued as a ground for variance.  It is simply an

16    argument that the -- and the record clearly shows here

17    the defendant was predisposed to commit these crimes.

18    Even the citation that was just given to the telephone

19    call shows that he was predisposed to be in possession

20    of weapons because it says in the quote that he hasn't

21    anything but the chopper.  The chopper, the record

22    showed, was an SK47, which is an assault rifle.

23         So the fact is that the undisputed -- I mean

24    the real record here, and the record shows that the

25    defendant was ready, willing and able to supply guns.

He may have had a lack of supply for a particular kind
of gun, but he had guns, and he had a system of
getting guns from which he could get whatever was
ordered up from him, and he was in the business of
supplying those guns, and he made money from it, and
he made money in this case from it.

And the fact of the matter is that the very
first situation that occurred here in the record is
that the defendant reached out to CI-1 before the sale
of the first gun.  It wasn't the other way around.
And that's in the PSR at paragraph 11, and it's not
objected to, and for good reason because the evidence
at the trial showed it.

The fact of the matter is there isn't
anything in the record that I've found that would
permit an amelioration of predisposition or guilt that
would in any way animate a variance to produce a
sentence that is sufficient but not greater than
necessary to accomplish the objectives of the
guidelines.

To the extent the defendant is asking for a
variance or a departure under 4A1.3, the guideline
says --

MR. MAGUIRE:  Your Honor, if I could just
make some correction that I feel compelled to make.

1          THE COURT:  What?

2          MR. MAGUIRE:  When you say "paragraph 11,"

3    you're relying on that paragraph 11, that's in the

4    PSR.  That came out in the report.  There was no

5    testimony from what I can see at the trial about that.

6          THE COURT:  But the point is that's in

7    paragraph 11 and it's not been objected to.  So I can

8    consider it.

9          MR. MAGUIRE:  Yes, Your Honor.

10         THE COURT:  But beyond that, the record

11   clearly shows beyond a reasonable doubt that he's

12   clearly predisposed to be engaged in dealing with

13   guns.

14         And here he's charged with possession of them

15   by a prohibited person.  In order to deal with them,

16   you've got to possess them.  And so he possessed them

17   in order to do that.  And the record clearly

18   established that.

19         4A1.3 provides for departures downward if

20   reliable information indicates that the defendant's

21   criminal history substantially overrepresents the

22   seriousness of the defendant's criminal history or the

23   likelihood that the defendant will commit other

24   crimes.

25         The converse of that permits an upward

departure. And the fact of the matter here is there's
nothing about the defendant's criminal history
category of VI that underrepresents either the
seriousness of his criminal history taken
substantially or the likelihood of recidivism. The
fact of the matter is there are I count, I think, 16
offenses for which he received zero points. The
argument is made that they were driving offenses.

Well, what they show -- I'll tell you what
his criminal history shows beyond any question is a
disregard for the law and a willingness to violate the
law whenever he chooses to, and it shows a
predisposition to violate the law, and, therefore, a
likelihood of recidivism. And the offense, the nature
of the offenses, even just those that are counted, are
quite serious as the government has argued. So I
don't find that a 4A1.3 departure is at all
appropriate.

The circumstances of this case, applying the
*Rybicki* analysis, simply don't call into play a
departure predicate. Even if you do, you identify the
guideline, even if there was a basis provided by the
assessment of the criminal history, one looks at
whether the facts call into play a particular
guideline. The only one that's called into play,

1  according to the defendant, is 4A1.3.  And then you

2  look at whether or not the facts of the case call for

3  application of the guideline, here 4A1.3, and they do

4  not at all.

5       So there wouldn't be any basis for a

6  departure to the extent that's what's intended in

7  pages eight and nine of the defendant's position.

8       Of course, you can consider a departure

9  ground as a ground for variance even if the proof

10  isn't sufficient to call into play the application of

11  the guideline as a departure.  And that certainly is

12  not the case here because the serious nature of the

13  defendant's criminal history and the demonstrated

14  recidivism.  So the grounds for a variance are denied.

15       Is there anything else that needs to be done?

16  Any sentencing argument?  No?  All right.

17       Can I hear from the defendant then?

18       MR. JONES:  Yes, sir, Judge.

19       Judge, I understand the Court's ruling as to

20  whether or not the departure or variance is

21  appropriate.  I would ask the Court in considering the

22  3553(a) factor as to the defendant's characteristics

23  to consider the letters that have been provided to the

24  Court --

25       THE COURT:  All right.

1    MR. JONES:  -- as to his good character.  He
2  is joined here in court today by numerous members of
3  his family.

4    THE COURT:  All right.

5    MR. JONES:  I would also ask the Court to
6  consider in going to the low end of the guidelines my
7  argument, although the Court has shown some disdain
8  for it as it applies to a variance.

9    THE COURT:  Disagreement with it.

10    MR. JONES:  A better word, sir.  Some
11  disagreement with it.  I would argue that it shows and
12  mitigates in comparison to the great -- in looking at
13  the panoply of types of 922 offenses, I think that
14  this shows because he did it at the action of the
15  government that it goes towards the bottom.

16    Judge, I do concede what the Court has
17  pointed out, Your Honor, that when the offense is to
18  possess something, to be selling it is an aggregating
19  factor.  I concede that, Judge, but I ask the Court to
20  mitigate that with the fact that he did so at the
21  behest of the government.

22    Lastly, Judge, I would argue that given his
23  age, given his personal situation, that 3553 would
24  warrant a sentence toward the lower end.  I do not
25  believe that this is the highest end of the guidelines

1 type of two offenses.

2         I'll rest on that, sir.

3         THE COURT:  All right.

4         Mr. Lucas, do you have anything to say before

5 sentence is imposed?  If you do, come to the lectern

6 and I'll hear what you have to say.

7         Yes, sir.

8         THE DEFENDANT:  I just want to apologize to

9 my family for putting them through this type of

10 situation.  And I want to say that my criminal history

11 doesn't represent the person I am today.

12         That's all, Your Honor.

13         THE COURT:  All right.

14         Applying Section 5G1.2 of the guidelines is

15 an appropriate exercise here as permitted by the

16 guidelines, and considering the guidelines as

17 advisory, and pursuant to 18 U.S.C. Section 3553(a),

18 it is the judgment of the Court that the defendant,

19 Nassau Lucas, is hereby committed to the custody of

20 the United States Bureau of Prisons to be imprisoned

21 for a term of 140 months consisting of 120 months on

22 Count Two and 20 months on Count Three to be served

23 consecutively.

24         The defendant is remanded to the custody of

25 the United States Marshal.

He shall be placed on supervised release upon release from imprisonment for three years consisting of three years on Count Two and three years on Count Three to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

While on supervision, the defendant shall not commit another federal, state or local crime, shall not unlawfully possess a controlled substance, and shall not possess a firearm or destructive device.

He shall comply with the standard conditions of supervised release and with the following special conditions:

(1)  He shall participate in a program approved by the probation office for substance abuse which may include residential treatment and testing to determine the use of drugs or alcohol, the cost to be paid by the defendant as directed by the probation officer.

(2)  He shall provide the probation officer access to requested financial information.

Considering all the financial information and factors, the defendant is not capable of paying a

fine, but he will pay a special assessment of $100 for each count of conviction, Counts Two and Three, for a total of $200.

The special assessment shall be due in full, payable immediately. Any balance remaining unpaid on the special assessment at the beginning of supervision shall be paid by the defendant in installments of not less than $25 a month until paid in full. Payments to begin 60 days after supervision begins. Payment shall be a special condition of supervised release.

Is there a forfeiture in this case, Mr. Maguire?

MR. MAGUIRE: There is, Your Honor. I don't have the forfeiture documents.

THE COURT: Do you have an order?

MR. MAGUIRE: I don't have any of that with me, Your Honor. I'm sorry, I don't.

THE COURT: Well, it hasn't been entered yet, is that what you're saying?

MR. MAGUIRE: Actually, I'm told that -- I'm informed that the estate has been purchased by the ATF from him. There's no need for forfeiture.

THE COURT: All right. There's no forfeiture then.

Mr. Lucas, I'm not suggesting there's a

reason for appeal or a right of appeal, but any appeal
that is to be taken must be taken by filing a written
notice of appeal with the clerk of the court in 14
days from the date of the judgment of the Court. And
if that's not done in that way, in that time, and in
that place, then whatever right of appeal that may
exist is lost forever.

Do you understand what I said?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Jones, are you appointed or
retained?

MR. JONES: Judge, I am retained. I
understand Mr. Lucas does intend to appeal. I am
going to file a written notice. I believe him now to
be indigent. I don't believe that he desires for me
to continue on. If the Court would appoint an
attorney to represent him in furtherance of the
appeal.

THE COURT: It is your responsibility at this
stage to file a timely notice of appeal if one is to
be filed.

MR. JONES: Yes, sir.

THE COURT: That doesn't obligate you to
handle the matter beyond that which by contract you
have arranged for with your client. And if you want

1  to represent the defendant on appeal, you can apply to
2  the Fourth Circuit, and I'm sure they'll be glad to
3  appoint you.
4       He just said, Mr. Lucas, you don't want Mr.
5  Jones to represent him on appeal.  Is that correct or
6  not correct?
7       THE DEFENDANT:  That's correct.
8       THE COURT:  I'm sorry.  I confused the way I
9  asked the question.  Do you want him to represent you
10 on appeal or do you not?
11      THE DEFENDANT:  I don't.
12      THE COURT:  All right.  Well, the Fourth
13 Circuit is going to have to do that.  So you'll make
14 arrangements for that.
15      MR. JONES:  Yes, sir, Judge.
16      THE COURT:  All right.
17      Mr. Lucas, I've imposed this sentence because
18 your record is really atrocious, and there's a need to
19 promote in you the respect for the law, to deter you
20 from violating the laws, which you continually do, and
21 to protect the public from the conduct.
22      Selling these weapons knowing that they were
23 going up to New York to be trafficked and sold is a
24 bad situation.  It could cause death and injury to
25 lots of different people.

1    It looks to me like you have the capacity
2  from the letters that I've received, which will be
3  placed in the file, and from the fact that you had a
4  good upbringing are capable of being a responsible
5  citizen.

6    I hope that when you get out of prison that
7  you pursue that aspect of life instead of what you've
8  been pursuing in the past and wish you the very best
9  in the rehabilitation of your life and in the service
10 of your sentence.

11    Mr. Maguire, here's a notebook that you sent
12 in with your exhibits, and you can have it back.

13    All right.  We'll be in adjournment.

14    (The proceedings were adjourned at 4:45 p.m.)

15

16  I, Diane J. Daffron, certify that the foregoing is
17  a correct transcript from the record of proceedings
18  in the above-entitled matter.

19
                    /s/
20     _____    _____
21       DIANE J. DAFFRON, RPR, CCR        DATE
22
23
24
25