## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| **NASAU I. LUCAS,** | **)** | **Crim. No. 3:15-CR-00077** |
| | **)** | **Hon. Robert E. Payne** |
| **Defendant/Petitioner,** | **)** | **Hon. Roderick Young** |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **Respondent.** | **)** | |

## <u>RESPONSE IN OPPOSITION TO § 2255 MOTION</u>

The United States hereby files this Response in Opposition to Petitioner Nassau Lucas's Motion Under 28 U.S.C. § 2255 to Vacate his conviction and sentence because of ineffectiveness of both his former trial counsel, Vaughan Jones, Esq., an experienced and highly respected member of the Virginia Bar, and former appellate counsel, Andrew M. Stewart, Esq.

Although Lucas raises many claims, his primary claim is that his counsel was ineffective in raising, investigating, and calling witnesses to support an entrapment defense. The trial record, however, conclusively establishes that Lucas specifically informed the Court he did not want to raise an entrapment defense because he did not want the jury to hear the predisposition evidence that he had a

prior record for possessing a firearm by a convicted felon.  (JA[1] 369 – 370.)  This unwillingness to raise an entrapment defense is more than corroborated by the Affidavit of Mr. Jones, attached hereto as Exhibit 1.  Indeed, the two video recordings of his criminal conduct that was the basis for his two counts of conviction made the evidence against Lucas "insurmountable."  Affidavit ¶ 1.  Therefore, the defendant does not come remotely close to meeting his heavy burden of showing incompetence and prejudice.  His Petition should be summarily denied.

## I.  BACKGROUND

Investigative.  A review of the defendant's criminal history starting in 2009 made it clear that he had committed numerous crimes, including 3 firearm offenses, drug possession, and drug trafficking.  Some crimes had even been committed while he was under court supervision from a previous conviction.   PSR ¶¶ 54 – 66.  Thus, his continuous illegal activities aroused the separate attention of two law enforcement agencies in 2014.  *See* Response in Opposition to Defendant's Motion for Downward Variance and Adjustment (JA 547 – 551, herein "Response").[2]

---

[1] "JA" references are to the Joint Appendix on the appeal.

[2] See also JA 14 – 16.

Accordingly, the Henrico County Police Department started a drug investigation in or about July 2014.  The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began a firearms trafficking investigation in or about late June 2014.  *Id.*  Both investigations used information from different informants.  ATF TFO Michael Kielb did more research into Lucas's prior record, lack of a job, and driving high-end vehicles like a Mercedez Benz and later a BMW.  Thus, there is no evidence that law enforcement negligently or irresponsibly targeted an innocent man.  In or about early August 2014, the two agencies joined forces.  *Id*.

The suspected firearm and drug offenses were the type of offenses that "present the police with unique and difficult detection problems because they are committed privately between individuals who are willing participants.  Consequently, in addition to employing search and seizure techniques, routine and electronic surveillance, and informants to expose such consensual crime, law enforcement officers resort to the use of encouragement [by the police or their agents]."  2 W. LaFave, <u>Criminal Procedure</u>, § 5.1(a) p. 621 (4d. Ed.) (herein "LaFave").  Indeed, because of the detection problems, the ATF and Henrico Police resorted to undercover encouragement operations.  *Id*.

Accordingly, as part of this joint investigation, on the afternoon of August 11, 2014, a Henrico Police confidential informant, who was secretly wired for

3

sound and photographing, made a purchase of one pound of marijuana from Lucas.
*Id*.

In the afternoon of August 13, 2014, ATF used an undercover police officer to purchase an Intratec 9mm semi-automatic pistol from the defendant in the parking lot of his apartment at 1467 Old Bronze Drive, Henrico, Virginia.  The undercover police vehicle was wired for sound and photographing.  The videotape of the deal introduced at trial, showed a smiling Lucas as he sold the gun, dispelling any notion that he was being improperly induced to sell the gun.  *Id*.

One month later, on September 12, 2014, ATF used two undercover police officers to purchase an SKS 7.62 caliber semiautomatic rifle from the defendant in the parking lot of the BP gas station at 1130 New Market Road, Richmond, Virginia.  The undercover police vehicle was wired for sound and video recording.
*Id*.

Finally, on the evening of November 5, 2014, a Henrico Police confidential informant was secretly wired for sound and photographing.  This CI made a purchase of approximately 40 grams of crack cocaine.  Because it was dark, the camera did not produce any recognizable pictures.  Because many people could be heard talking on the audio portion, the audio portion did not produce any recognizable conversation.  Because of the location of the deal, the police could not watch the deal taking place.  *Id.*  As will be explained, counts one and four,

which were based on the Henrico drug purchases, were severed (JA # 5, Docket # 32), and dismissed after the convictions on the firearm counts in counts two and three).  (JA 7, Docket No. 63).

Procedural.  On April 22, 2015, Lucas was indicted in the Eastern District of Virginia on two drug counts and two firearm counts.  (JA 10-13.) Count one charged distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).  Count two charged possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Count three charged possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Count four charged distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).

On December 22, 2015, Lucas moved for separate trials for the firearms possession charges and the narcotics distribution charges. (JA 14-17.)  Lucas' motion was granted on December 28, 2015. (JA 18.)  Trial commenced on December 29, 2015 for just the two firearms possession charges.  (JA 28.)

After a two-day jury trial, Lucas was convicted on both counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (JA 533.) At sentencing--and in his pre-sentencing filings--Lucas argued that his illicit possession of firearms was the direct result of undercover law enforcement interest in purchasing those weapons. (JA 542; JA 567-568.) Lucas did not argue, however, that he was entrapped--merely that he was a reluctant illicit seller of firearms. (JA

579-580.)

The district court was unpersuaded by Lucas' argument, (JA 572), and sentenced him to a total of 140 months' incarceration, (JA 592), the low end of the advisory U.S. Sentencing Guidelines' range, (JA 637).

## II.  SUMMARY OF EVIDENCE

On January 20, 2011, Lucas received a notice from his probation officer informing him that, as a result of a prior felony conviction, he was prohibited from possessing a firearm. (JA 386.) Lucas' firearm possession rights have not been restored by the Commonwealth of Virginia.  (JA 386.)

<u>August 13, 2014 Firearm Transaction</u>

In June 2014, Detective Kielb, a Richmond police officer assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), began investigating Lucas for his possible involvement with weapons trafficking. (JA 107.) During that investigation, Detective Kielb used a paid confidential informant ("CI-1"), who was familiar with Lucas. (JA 179-180).  On August 10, 2014, CI-1 informed Kielb that Lucas had contacted him and offered to sell him a Tec-9 semi-automatic pistol for $1000.00. (JA 614.) CI-1 indicated that he would attempt to negotiate down the price of the weapon and arrange to purchase the weapon from Lucas. (JA 614.)

On August 13, 2014, at 10:00am, Lucas contacted CI-1 and agreed to lower the price of the Tec-9 that he had previously offered to $850. Lucas contacted CI-1

again at approximately 1:30pm and provided CI-1 with an address for an apartment complex in Richmond, Virginia at which the Tec-9 sale would take place. (JA 614.) At approximately 3:30 pm on August 13, 2014, CI-1 and Officer Erica Hall, a Richmond police officer who was working undercover, (JA 195-196), arrived at the address Lucas had earlier provided in a vehicle that was outfitted with surveillance equipment. (JA 162-168; JA 197.) CI-1 texted Lucas to alert him of his and Officer Hall's arrival. (JA 199.)

Thirty seconds or a minute after CI-1 texted Lucas, Lucas exited an apartment at that address, walked to a parked blue BMW, retrieved a black backpack from the backseat of that vehicle, and then entered Hall's vehicle. (JA 199; JA 207-209 (Officer Hall narrating surveillance footage).) Lucas sat in the front passenger seat, informed Hall that "the jank [firearm]" was in the backpack, and retrieved a dusty Tec-9 from the backpack and began to wipe it down. (JA 199-202; JA 210.) Officer Hall rebuked Lucas, telling him, "don't even bother cleaning it out, because if you was [sic] going to clean it, you should have cleaned it before you gave it to me." (JA 499.)

After Lucas handed her the bag with the Tec-9, Officer Hall then handed Lucas $850.00 in cash. (JA 210.) As Lucas was counting the money, he received a phone call and, immediately following the phone call, departed the vehicle, explaining that police were circling the area. (JA 210; JA 499.) Thus, Lucas had his

own surveillance team watching the deal and protecting him.

When Officer Hall returned to the ATF staging area, a black backpack (JA 133), Tec-9 semi-automatic pistol (JA 133), an extended 35-round Tec-9 magazine (JA 133; JA 341), and "32 rounds of WOLF ammunition" were recovered from the backseat of Officer Hall's vehicle, (JA 133). The weapon was later identified by an ATF firearms expert, who determined it to be operable and to have been manufactured in Miami, Florida. (JA 339-340.)

### September 12, 2014 Firearm Transaction

On September 11, 2014, an undercover police officer, Detective Fernandez, placed a recorded phone call to Lucas to inquire about purchasing a firearm. (JA 138-146; JA 273-278.)  Fernandez represented himself as someone who intended to buy firearms from Lucas to resell in New York. (JA 278.)  Fernandez also claimed that he had spoken with CI-1 and CI-1 had given him Lucas' number. (JA 277.) Lucas responded that CI-1 had informed Lucas about Fernandez. (JA 510.)  Upon recognizing Fernandez, Lucas volunteered that at the moment all he had was a "chopper"--a slang term for an assault rifle, (JA 277). (JA 510.) Lucas went on to say he "might get something . . . you know . . . like, uh, glock" but that he was "still waiting for that shit right now." (JA 510; JA 277-278.)  However, Lucas emphasized that the chopper was "on hand[]," and agreed to meet with Fernandez the following day. (JA 511.)

On September 12, 2014, Detective Fernandez again placed a recorded phone call to Lucas, (JA 148-149; JA 280), and Lucas informed Detective Fernandez that he was unable to acquire a Glock semi-automatic pistol but that he still had the "chopper" for sale. (JA 280-281.) At approximately 12:30 pm, Lucas sent Fernandez a text message with an address in Henrico, Virginia at which to meet. Fernandez complained that he needed a location closer to the interstate so that he could easily get on the highway and get back to New York to resell the firearm, so Lucas suggested a 7-Eleven convenience store in Henrico, Virginia. (JA 281. *See also* JA 149.) Detective Fernandez drove himself and Officer Hall, both acting undercover, to the 7-Eleven in a vehicle outfitted with surveillance equipment. (JA 212; JA 281-282.)

At approximately 1:40 pm, Lucas and an unidentified man arrived at the 7-Eleven in the same blue BMW from which he retrieved the black backpack on August 13. (JA 213; JA 216.)  Upon arrival, Lucas decided the 7-Eleven was too crowded, (JA 214; JA 288), so he called Fernandez and arranged to meet instead across the street at a BP gas station. (JA 150; JA 212; JA 214; JA 282-283). Officer Hall and Detective Fernandez followed Lucas' vehicle across the street from the parking lot of the 7-Eleven to the BP, where both vehicles parked near the vehicle vacuuming station. (JA 216-217.)

Lucas exited his vehicle, retrieved a large green bag from the backseat of the

blue BMW, and approached Hall and Fernandez's vehicle. (JA 221; JA 283-284.) As Lucas walked toward Hall and Fernandez's vehicle, carrying the large green bag, (JA 221-222), the unidentified male exited Lucas' vehicle and began vacuuming, or pretending to vacuum, it. (JA 221; JA 284.)  Lucas placed the large green bag in the backseat of Hall and Fernandez's vehicle, and then sat down in the front passenger seat. (JA 284-285.) Fernandez shook Lucas' hand and gave him $800.00.  (JA 286.)

Lucas then explained that his firearms source had sold two Glock models the night before, (JA 289; JA 518), but would have additional weapons available in the coming week, should Fernandez want additional firearms (JA 289-290; JA 518). Lucas explained he should have a "[c]ompact Glock" by September 17, but he could not give a price until he knew how much his source would charge him for it. (JA 519.)

Following the sale, Officer Hall and Detective Fernandez returned to the ATF staging area where a Norinco SKS semi-automatic rifle, a 30-round magazine, and 24 7.62 mm rounds were recovered from the large green bag found in the backseat of Hall and Fernandez's vehicle. (JA 157-158; JA 224 (identifying the large green bag and the SKS semi-automatic rifle).) An ATF firearms expert later identified the SKS as a Chinese manufacture of the Soviet Union's primary military assault rifle from 1943 until the introduction of the AK-47 assault rifle. (JA 345-346.)  The ATF firearms expert opined that it was likely imported into the United States before 1968.

(JA 346-347.) The ATF Firearms expert also determined the Norinco SKS is operable as a firearm. (JA 350.)

On September 15, 2014, Detective Fernandez placed another recorded phone call to Lucas. (JA 291-293.) In that call, Fernandez inquired as to whether Lucas had the additional weapons he referenced during the September 12, 2014 transaction, and Lucas asked what sort of weapons Fernandez would like to buy. (JA 522-523.) Fernandez referenced the compact Glock that Lucas had offered up on September 12, as well as a "shotty." (JA 524. "[S]hotty" is a slang term for a shotgun. (JA 293.)) Lucas responded that he would "see what I can do for you." (JA 524.)

## III.  ARGUMENT

### A.    2255 - IN GENERAL.

A federal prisoner in custody may collaterally attack his sentence or conviction by moving or applying to the district court under Section 2255(a) to vacate or set aside his sentence.  The Supreme Court has held that there are four grounds for relief based on the four phrases in the statute.  Those grounds are:  "(1) that the sentence was imposed in in violation of the Constitution or laws of the United States, (2) that the court was without jurisdiction to impose such a sentence, (3) that the court was without jurisdiction to impose such a sentence, and (4) that the sentence is other is otherwise subject to collateral attack."  *Hill v. United States,* 368 U.S. 424, 426 – 27 (1962) (internal quotation marks omitted.)

The defendant has the burden to prove his case by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). Because the motion "is ordinarily presented to the judge who presided at the original conviction and sentencing . . . the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion." *Blackledge v. Allison*, 431 U.S. 63, 74 n. 4 (1977).

Procedural Default. The law on this point is clear. A claim not raised on direct appeal cannot be heard on collateral review unless the applicant shows "cause" for failure to raise his claims earlier in the appeal process, and "actual prejudice." *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991); *United States v. Frady*, 456 U.S. 152, 170 (1982); *United States v. Landrum*, 93 F.3d 122, 124 (4th Cir. 1996) ("[a] claim raised for the first time in a ' 2255 motion generally is not cognizable in federal court unless Petitioner demonstrates both (1) cause excusing his . . . procedural default, and (2) actual prejudice resulting from the errors of which he complains."). That standard requires the Petitioner to show not only that "some objective factor external to the defense" impeded his efforts to raise the issue as required by each relevant procedural rule, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error," *Frady*, 456 U.S. at 170 (emphasis in original). The cause and prejudice standard is more difficult to

meet than the plain error standard, which applies to defaulted claims on direct review.  *See Frady*, 456 U.S. at 164-166.

In *McCleskey*, the Supreme Court held that in order to demonstrate "cause" for not raising a claim earlier in the appeal process, a Petitioner must make "a showing that the factual or legal basis for a claim was not reasonably available to defense counsel." 499 U.S. at 493.  The Supreme Court in *McCleskey* held that subsequent discovery of evidence to support a claim that could have been raised earlier is insufficient to excuse the Petitioner=s failure to raise his claims earlier in the appeal process.  499 U.S. at 497.

Of course, a defendant who can demonstrate he is actually innocent can avoid the cause and prejudice standard.  *See, e.g., Bousley, v. United States*, 523 U.S. 614, 621-22 (1998) and *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Although many defendants make this claim, exceedingly few such claims are ever found to be meritorious.  ACourts, including the Fourth Circuit, have been reluctant to extend the >actual innocence exception= to sentencing issues that have been procedurally defaulted.@  C. Horn, Fourth Circuit Criminal Handbook (2018 Ed.) ' 340 at p. 820, citing *United States v. Mikalajunas*, 186 F.3d 490, 494-96 (4th Cir. 1999).

## B.  INEFFECTIVENESS OF COUNSEL

In Claims One, Three, Four, Five, and Six, Petitioner Lucas claims that trial defense counsel, Vaughan Jones, and his appellate counsel, Andrew M. Stewart, were ineffective in numerous ways.[3]  Because the defendant fails to meet his heavy burden of establishing prejudice or incompetence, his petition should be summarily denied.

<u>General Legal Principles</u>.  A defendant seeking relief for ineffective assistance of counsel carries the burden to establish two requirements.  "First, the defendant must show deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the attorney's error 'prejudiced the defense.'"  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To satisfy the deficient performance prong, the defendant must overcome the " 'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.' " *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (*quoting Strickland*, 466 U.S. at 689).  *See also United States v.*

---

[3] Many of the specific claims of ineffectiveness are contained in the Memorandum (Docket # 76) instead of the Petition (Docket # 75).

*Harris*, 2018 WL 3614968 (E.D. Va. 2018), *appeal docketed*, No. 18-7043 (4th Cir. Aug. 22, 2018).

Under the second prong, known as the prejudice prong, he must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The petitioner bears the burden of proving prejudice. *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983); *see Goodson v. United States*, 564 F.2d 1071 (4th Cir. 1977) (incorrect advice or trial errors must be prejudicial to warrant relief); *Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (fact that counsel could have done more is insufficient without showing of harmful consequences).[4]

"[W]hen a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on the 'fundamental fairness of the proceeding.'" *Id*. at 1911. The fundamental fairness of American criminal proceedings are evaluated through the lens of the adversary system. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) (citing *Strickland*, 466 U.S. at 685). In an adversary system, proceedings are not repeated until neither side has committed an error that could affect the outcome of the proceedings.

---

[4] The competence prong can be bypassed if it is easier to dispose of the claim on the ground of lack of prejudice. *Strickland*, 466 U.S. at 697.

The adversary system and constitutional standards place a variety of limits on the public's interest in ensuring that crimes are not committed and public safety is protected.  For example, at trial, after jeopardy attaches, virtually all errors by both the prosecutor and the trial court cannot be corrected.  *See, e.g., Evans v. Michigan*, 568 U.S. 313 (2013) (court's midtrial acquittal based on court's erroneous requirement of extra element triggered double-jeopardy bar); *Sanabria v. United States*, 437 U.S. 54, 64 (1978) (double-jeopardy bar precludes government appeal of erroneous exclusion of evidence after trial begins).

Likewise, at sentencing, a variety of limits constrain increases in a defendant's sentence.  Once the sentence has reached finality and a defendant has begun serving the sentence, increases in the sentence may be barred where no de novo resentencing is being held.  *See, e.g., United States v. Cook*, 890 F.2d 672, 675 (4th Cir. 1989) ("[I]t would be fundamentally unfair and a violation of due process to allow a district court to enhance a sentence 'after the defendant has served so much of his sentence that his expectations as to its finality have crystalized'").  Likewise, a prosecutor's unappealed errors may not be later corrected.  *See, e.g., Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation.").  On appeal, unpreserved errors by the government that are not "plain" would not be corrected.  *See, e.g.,*

*United States v. Marcus*, 560 U.S. 258, 262 (2010).  Indeed, under the Ex Post

Facto Clause even a new guideline amendment that would increase an advisory

guideline range may not be applied after a defendant has acted, much less after

sentencing.  *Peugh v. United States*, 569 U.S. 530, 541 (2013).

The adversary system also places some limits on defendants' abilities to

rerun proceedings to correct errors.  As the Supreme Court has repeatedly stressed,

"An ineffective-assistance claim can function as a way to escape rules of waiver

and forfeiture and raise issues not presented at trial, and so the *Strickland* standard

must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the

integrity of the very adversary process the right to counsel is meant to serve."

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at

689-90).  *See also Weaver*, 137 S. Ct. at 1912 (citing *Harrington*, 562 U.S. at 105;

*Premo v. Moore*, 562 U.S. 115, 122 (2011)).

Furthermore, a court may deny a § 2255 motion without a hearing when the

motion only states "legal conclusions with no supporting factual allegations".  *See*

*Raines v. United States*, 423 F.2d 526, 531 (4th Cir. 1970) (quoting *Sanders v.*

*United States*, 373 U.S. 1, 19 (1962)).

In judging a defense attorney's performance, courts must evaluate the

attorney's performance using the law in effect at the time the attorney acted.  *See,*

*e.g, United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014) ("We have

consistently made clear that we do not penalize attorneys for failing to bring novel or long-shot contentions."), *cert. denied*, 136 S. Ct. 514 (2015); *United States v. Dyess*, 730 F.3d 354, 363 (4th Cir. 2013) (defense lawyer's failure to anticipate new rule was not ineffective); *United States v. Baker*, 719 F.3d 313, 321 (4th Cir. 2013) (performance prong of *Strickland* ineffective-assistance standard is "governed by the law as it stood when the defendant's lawyer acted," while prejudice prong is governed by current law) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)); *United States v. McNamara*, 74 F.3d 514, 516 (4th Cir. 1996) (defense counsel not ineffective for failing to raise issue on which Supreme Court had granted certiorari at the time attorney acted but where Court had not ruled). *Cf. Maryland v. Kulbicki*, 136 S. Ct. 2, 4 (2015) (per curiam) (summarily reversing where court of appeals found defense counsel ineffective for failing to challenge forensic evidence of comparative bullet lead analysis in light of new scientific developments; court should have "judge[d] the reasonableness of counsel's challenged conduct … viewed as of the time of counsel's conduct") (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)).

Defense attorneys are not required to raise every debatable point or correctly predict the outcome of every novel legal issue that might be raised. This rule is not limited to strategic decisions to favor one argument over another. "Even if an omission" by a defense attorney in making an argument "is inadvertent, relief is

not automatic.  The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984).

## 1.  Trial Counsel – Claims One, Three, Four, and Six

### a.  Failure to Raise Entrapment Defense

In Claims One, Three, and Four, Lucas alleges trial counsel was ineffective in failing to: raise an entrapment defense; ask for an entrapment jury instruction; and not calling Thomas Jones to support he entrapment defense. (§ 2255 Petition pp. 5, 8 and 9, and Memorandum p. 27).  This is simply ludicrous because both his counsel and the defendant himself expressly informed the court that it was "**Mr. Lucas's decision to not seek an entrapment instruction." (**JA 369) (Emphasis supplied.) Defense counsel further explained the rational for the decision was not to "open up the government's ability to inform the jury about the nature of his prior felony (for possessing a firearm by a convicted felon)."  *Id*.  To protect the record, the court directly questioned Mr. Lucas to make sure he understood and joined in the decision not to seek an entrapment instruction.  JA 369 – 370.  The knowing and voluntary nature of this decision is also supported by the Vaughan Affidavit ¶ 10.

Thomas Jones.  As part of his entrapment claim, Lucas alleges counsel was ineffective in not calling Thomas Jones as a witness, to support the entrapment defense.  2255 Petition 8 - 9 and Memorandum 42.  He also claims that the failure to call Jones as a witness violated his confrontation clause rights and *Crawford v. Washington*, 541 U.S. 36 (2004).  *Id*.  These generalized assertions do not make a valid claim.

Defense counsel's Affidavit establishes that there was no information that Mr. Lucas provided to defense counsel that Mr. Jones or any other potential witness had any information that would be helpful or relevant to the defense of Lucas.  Affidavit ¶¶ 3 and 11.  Indeed, if Lucas was not raising an entrapment defense to prevent the government from introducing predisposition evidence, it is hard to understand, and Lucas certainly does not identify, how Mr. Jones would be helpful as a witness.[5]

The defendant also fails to state a valid confrontation clause claim under *Crawford*.  In this murder-by-stabbing case, the trial court admitted at trial the recorded statement of Crawford's wife to the police as evidence that the stabbing was not in self-defense.  Because of the marital privilege, the wife did not testify at

---

[5] For a thorough discussion of how Mr. Lucas did not satisfy any of the requirements for a valid entrapment defense, especially the threshold "inducement" requirement.  *See* "Government's Response In Opposition To Defendant's Motion for Downward Variance and Adjustment."  (JA 547, Docket # 54, pp. 4 – 13).

trial.  The Supreme Court reversed the conviction on the ground that the admission of the wife's statement to the police violated the Confrontation Clause.

The key predicate for a *Crawford* claim is the admission into evidence of a hearsay statement of a person who did not testify at trial.  In the present case, the defendant has not shown that the government introduced any hearsay statements of Mr. Thomas Jones at the trial.  Indeed, no such evidence was elicited at the trial. The key witnesses against the defendant were the two undercover police officers to whom Lucas sold the firearms.  Both were subject to extensive cross-examination.

Therefore, the defendant fails to establish either incompetence or prejudice.

### b.  Misidentification and Voice Recordings

Lucas makes a conclusory claim that his trial counsel failed to adequately investigate and provide evidence of misidentification, to suppress the identification evidence, and to contest the voice recordings of Lucas with the undercover police officer.  Memorandum p. 27.  This vague allegation fails to demonstrate a viable basis for a misidentification defense.  Lucas was shown on two video recordings in the act of selling assault weapons to an undercover police officer.  There was no viable defense or issue of misidentification.  *See also* Vaughan Affidavit ¶ 3.  The same is true with respect to the voice recordings.  *Id*.

21

### c. Firearms Testing

Lucas claims that counsel failed to conduct an investigation of the firearms and to obtain independent testing thereof.  Memorandum p. 27.  Lucas, however, has not identified what such investigation or testing would have yielded.  Indeed, Mr. Vaughan saw no relevance to such a tack. Vaughan Affidavit ¶ 3.

### d. Voire Dire and Cross Examination

Lucas baldly claims that counsel failed to properly voire dire the jury and to cross-examine the government witnesses.  Memorandum p. 28.  Lucas again has not identified a different voire dire or cross-examination that should have been performed, or what such would have yielded.  Indeed, the Vaughan Affidavit refutes this.  *Id*.

### e. Social History

Lucas claims that counsel failed to obtain an expert to prepare a social history. Lucas, however, has not identified what such social history would have yielded and how it would have been admissible at trial.  As for sentencing, Lucas has not identified anything that was not already in the PSR.  *Id.* at 9.

### f. Failure Re Potential Witnesses

Lucas broadly claims that counsel failed to "investigate, locate, and present witness' testimony which could have affected evaluation of truthfulness of prosecution witnesses."  Lucas, however, has not identified what such investigation,

location or presentation would have yielded.  Indeed, Mr. Vaughan received no information regarding potential witnesses from Lucas.  *Id*. at ¶ 3.

### g.  Failure Re Scientific Aspects

Lucas generally claims that counsel failed to conduct an investigation of the scientific aspects of the government's case.  Memorandum 28.  Lucas, however, has again not identified what such investigation or testing would have yielded.

### h.  Failure Re Fingerprint Expert

Lucas claims that counsel failed to consult with or retain a fingerprint expert. Lucas, however, has not identified what such consultation or retention would have yielded.  Indeed, Mr. Vaughan saw no relevance to such a tack.  *Id*.

### i.  Failure to Object

Lucas claims that counsel failed to object in 15 different instances. Memorandum pp. 28 – 30.  Lucas, however, has not identified any particularized ground for objection, nor has he identified what such an objection would have yielded.  Mr. Vaughan states that he in fact objected to much of the government's evidence.  Affidavit ¶ 4.  Standard trial tactics also warn against objecting too much because juries do not like it.  T. Mauet, Trial Techniques and Trials, §§10.3 and 10.5, pp. 509 – 514 (9th Ed. 2013).  Moreover, "(t)here's little point in making an objection unless you have a realistic chance of getting our objection sustained. . . .  Every time you make and lose an objection, your stock falls."  *Id*. at p. 511

### j. Heightened Mens Rea Instruction

In Claim Six, Lucas asserts that counsel failed to request a mens rea or heightened scienter requirement as required by *Staples v. United States*, 511 U.S. 600 (1994).  Memorandum p. 48.  Such instruction was not required in Lucas's garden-variety felon-in-possession prosecution, under 18 U.S.C. § 922(g)(1), which was part of the Firearms Owners' Protection Act of 1986.  *Staples* only applies to the possession of specialized weapons, like machine guns, under 26 U.S.C. § 5861 which was enacted as part of the National Firearms Act.  *See United States v. Langley*, 62 F.3d 602 (4th Cir. 1995) and *United States v. Tomlinson*, 67 F.3d 508 (4th Cir. 1995).  Therefore, Lucas again fails to meet his heavy burden of establishing incompetence.

### 2. Appellate Counsel – Claim Five

In Claim Five, Lucas also asserts that appellate counsel inappropriately filed an *Anders* brief when in fact Lucas had a valid entrapment defense.  This is the same contention made with respect to trial counsel.  For the same reasons, namely, that Lucas waived such defense (and indeed had no viable entrapment defense, in any event), Lucas has not made a valid claim with respect to appellate counsel.  Moreover, a presumption exists that appellate counsel "decided which issues were most likely to afford relief on appeal." *Bell v. Jarvis,* 236 F.3d 149, 164 (4th Cir. 2000) (quoting *Pruett v. Thompson*, 996 F. 2d 1560, 1568 (4th Cir. 1993) ). "[O]nly

when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000) ).  As explained above, Lucas expressly declined to raise an entrapment defense.  Therefore, Lucas's appellate counsel reasonably avoided raising this issue on appeal.

## C.  SUFFICIENCY OF EVIDENCE

Claim Two.  In Claim Two, Lucas alleges that the Government has mischaracterized the evidence against him.  2255 Motion p.  6 and Memorandum p. 37.  This is in substance a challenge to the sufficiency of evidence.  Because Lucas never raised this argument on direct appeal, the doctrine of procedural default bars this claim.  *Coleman v. Thompson*, 501 U.S. 722 (1991); *McKay v. United States*, 657 F.3d 1190 (11th Cir. 2011).  To the extent Lucas is raising this as part of an ineffectiveness claim, the baldness of his conclusory assertion is insufficient to meet his heavy burden.   *See Raines v. United States*, 423 F.2d 526, 531 (4th Cir. 1970).

In the present case, even if the Court could review the matter, the evidence was overwhelming, and therefore was sufficient.  Indeed, defense counsel described the video tape evidence of Lucas twice distributing a firearm to an undercover police officer, as "insurmountable."  Affidavit ¶¶ 1, 2, and 8.

## D.  NECESSITY OF A HEARING

Claim Seven.  In Claim Seven, Lucas states that he is entitled to an evidentiary hearing.  However, he has not made a sufficient showing.

In *Raines v. United States*, 423 F.2d 526 (4th Cir. 1970), the Court listed three means of properly disposing of § 2255 motions: (1) summary dispositions; (2) dispositions on expanded records; and (3) evidentiary hearings. *Id*. at 529-30. Section 2255(b) permits the Court to summarily dismiss a claim if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . "  Allegations that are vague, conclusory or palpably incredible do not raise factual issue entitling a petitioner to a full hearing. *Id*. at 531 (citing to *Machibroda v. United States*, 368 U.S. 487, 495 (1962) ).  Furthermore, "no hearing is required if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.' " *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)).  *See also United States v. Harris*, 2018 WL 3614968 (E.D.Va. 2018), *appeal docketed*, No. 18-7043 (4th Cir. Aug. 22, 2018). In the present case, summary dismissal is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court to deny Petitioner Lucas's § 2255 Motion.  Petitioner's allegations of ineffective

assistance of counsel fail to meet either *Strickland* requirement.  Indeed, the record as a whole establishes that Lucas received effective assistance of counsel.  His § 2255 Motion should therefore be denied.

## V.  NOTICE TO PETITIONER

Pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Civil Rule 7(K), promulgated by the United States District Court for the Eastern District of Virginia, the defendant is herewith notified and warned that:

1) You are entitled to file a reply opposing the government response.  Any such response must be filed within twenty-one days of the date on which the government's response was filed.

2) The Court possesses the authority to dismiss this action on the basis of the government's response if you do not file a reply.  If the Court dismisses this action or enters judgment for the government, the case will be concluded and the Court will have decided this case against you.

3) If you file a reply, you must identify in the reply all facts stated by the government with which you disagree and must set forth your version of the facts by offering affidavits (written statements signed before a notary public and under oath) or by filing sworn statements (bearing a certificate

that is signed under penalty of perjury) of your own and of any other witness and/or by submitting other responsive materials, as appropriate.

4) You are also entitled to file a legal brief in opposition to the one filed by the government.

You are further reminded that no pleadings or other documents submitted by you will be filed by the clerk unless you also attach a certificate of service stating that you have served or will serve copies thereof upon undersigned counsel for the government.  The certificate of service shall show the date and manner of service. See Rule 5 of the Federal Rules of Civil Procedure.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    _____/s/_____
David T. Maguire
Assistant United States Attorney
Va. Bar # 29323
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone:   804-819-5400
Fax:     804-771-2316
david.maguire@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 6, 2019, a copy of this

Response was (1) electronically filed and (2) mailed first class to the following:

> Nassau Lucas
> #86070-083
> F.C.I. Beckley
> P.O. Box 350 OAK B/U
> Beaver, WV 25813

> _____/s/_____
> David T. Maguire
> Assistant United States Attorney